**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ANTHONY G. BROWN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **16 CV 10422** |
| | ) | |
| **v.** | ) | **Judge John Z. Lee** |
| | ) | |
| **DR. SALEH OBAISI, DR. LOUIS SHICKER,** | ) | |
| **DR. A. MARTIJA, MS. LATANYA** | ) | |
| **WILLIAMS, and WEXFORD HEALTH** | ) | |
| **SOURCES, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Anthony Brown, an inmate at Stateville Correctional Center, brought this action under 42 U.S.C. § 1983 against Defendants Saleh Obaisi ("Dr. Obaisi"),[1] Alma Martija ("Dr. Martija"), LaTanya Williams ("Ms. Williams"), and Wexford Health Sources, Inc. ("Wexford") (collectively, the "Wexford Defendants"), claiming that they violated the Eighth Amendment's prohibition on cruel and unusual punishment by being deliberately indifferent to Brown's medical conditions. Brown is also suing Louis Shicker ("Dr. Shicker"), the Agency Medical Director of the Illinois Department of Corrections ("IDOC"). The Wexford Defendants and Dr. Shicker have filed motions for summary judgment. For the reasons given below, Defendants' motions are granted.

---

[1] Dr. Obaisi passed away during the course of this action. Pl.'s Mot. Substitute Parties ¶ 1, ECF No. 79. Ghaliah Obaisi, Independent Executor of the Estate of Saleh Obaisi, has been substituted for Dr. Obaisi. ECF No. 81.

## Factual Background[2]

Defendant Wexford is a medical contractor that provides medical services to inmates at Stateville Correctional Center. Wexford Defs.' LR 56.1(a)(3) Stmt. ¶ 2, ECF No. 59. Wexford employed Dr. Obaisi, Dr. Martija, and Ms. Williams as medical personnel at Stateville. *Id.* ¶¶ 3–5. Dr. Obaisi was Stateville's medical director; Dr. Martija was a staff physician; and Ms. Williams was a physician's assistant. *Id.* Dr. Shicker was the IDOC Agency Medical Director. Shicker's LR 56.1(a)(3) Stmt. ¶ 2, ECF No. 54.

### I. Medical Treatment at Stateville

Brown has been diagnosed with four medical conditions pertinent to this lawsuit: benign prostatic hyperplasia; degenerative joint disease; presbyopia; and asthma. Wexford Defs.' LR 56.1(a)(3) Stmt. ¶¶ 9, 38, 52, 65. The following facts pertain to the treatment Brown received at Stateville for each condition.

#### A. Benign Prostatic Hyperplasia ("BPH")

BPH is the condition of having an enlarged prostate. *Id.* ¶ 47. It is common among men over 50 and often causes uncomfortable urinary frequency and incontinence. *Id.* ¶¶ 47, 50. BPH is generally diagnosed via digital rectal examination. *Id.* ¶ 48. Typical treatments include medication and lifestyle changes, such as drinking fewer liquids. *Id.* ¶ 49.

Prior to the events pertaining to this case, Brown was diagnosed with BPH, for which he was prescribed the medication Hytrin. *Id.* ¶ 51. Brown's BPH does not cause him pain. *Id.* ¶ 46. Rather, it causes him "sleep problems," as he often wakes up in the middle of the night to urinate. *Id.*; Pl.'s Wexford LR 56.1(b)(3)(C) Stmt. ¶ 2, ECF No. 64.

---

[2] The following facts are undisputed or deemed admitted except where otherwise noted.

In October 2013, Brown had an appointment with Ms. Williams concerning his urinary frequency issues. Wexford Defs.' LR 56.1(a)(3) Stmt. ¶ 51. At the appointment, Ms. Williams performed a digital rectal examination, which revealed a slightly enlarged prostate. *Id*. ¶ 52. Ms. Williams confirmed Brown's BPH diagnosis, increased Brown's Hytrin dosage, and provided Brown with information about the condition. *Id*. She also ordered several lab tests to rule out more serious conditions, such as prostate cancer. *Id*.

Brown next complained about having to urinate too frequently at an appointment with Dr. Obaisi in January 2015. *Id*. ¶ 54. Dr. Obaisi switched Brown's medication from Hytrin to Flomax, another medication used to treat BPH. *Id*. Brown returned for a follow-up with Dr. Obaisi the next month and again complained of urinary-frequency issues. *Id*. ¶ 55. In response, Dr. Obaisi increased Brown's Flomax dosage from one to two pills per day. *Id*. At Brown's next appointment with Dr. Obaisi in March 2015, Brown informed Dr. Obaisi that Hytrin had worked better than Flomax. *Id*. ¶ 56. Dr. Obaisi switched Brown's prescription back to Hytrin, but at an increased dosage. *Id*.

At Brown's next appointment with Dr. Obaisi in August 2015, Brown's continued symptoms prompted Dr. Obaisi to re-prescribe Flomax in addition to Hytrin. *Id*. ¶ 57. Between August 2015 and March 2016, Brown had multiple appointments with Dr. Obaisi, Dr. Martija, and Ms. Williams, at which he did not complain about BPH symptoms. *See* Wexford Defs.' Ex. 5, Brown Medical Records, at 17, 21, 24–28, ECF No. 59-5.

Then, in March 2016, Brown again complained about the same symptoms to Dr. Obaisi. Wexford Defs.' LR 56.1(a)(3) Stmt. ¶ 59. In response, Dr. Obaisi ordered a post-void residual urine measurement test to identify the amount of urine left in Brown's bladder after urination. *Id*. Brown received the test on April 3. *Id*. ¶ 60. In April 2016, after reviewing the test results, Dr.

Obaisi prescribed Brown an additional medication, Oxybutynin, which is used to treat overactive bladders. *Id.* ¶ 61.

Brown's next appointment with Dr. Obaisi took place in January 2017, at which time Brown informed Dr. Obaisi that he was still suffering from the same symptoms. *Id.* ¶ 62. In response, Dr. Obaisi ordered a second post-void residual urine measurement test. *Id.* And, later in 2017, Dr. Obaisi referred Brown for a urology consultation at the University of Illinois at Chicago Medical Center ("UIC"). *Id.* ¶ 63; Wexford Defs.' Ex. 2, Obaisi Decl. ¶ 27, ECF No. 59-2. Dr. Obaisi stated that he made the referral "based upon [Brown's] continued complaints of urinary frequency despite receiving a variety of medications to treat this condition." Wexford Defs.' Ex. 2, Obaisi Decl. ¶ 27.

### B. Degenerative Joint Disease ("DJD")

Brown first complained of pain in his shoulders at an appointment with Ms. Williams on October 2, 2015. Wexford Defs.' LR 56.1(a)(3) Stmt. ¶ 33. Ms. Williams ordered an X-ray of Brown's shoulders and prescribed Tylenol. *Id.* Brown rejected the Tylenol prescription and requested that Ms. Williams refill his Tramadol prescription instead. *Id.* ¶¶ 32–33; Pl.'s Wexford LR 56.1(b)(3)(C) Stmt. ¶ 5. Brown had previously been prescribed Tramadol, a narcotic-strength medication used to treat moderate to severe pain, for lower back pain. Wexford Defs.' LR 56.1(a)(3) Stmt. ¶¶ 30–31. As a physician's assistant, Ms. Williams did not have authority to prescribe narcotic-strength medications such as Tramadol for an extended period. *Id.* ¶ 34. Instead, Ms. Williams referred Brown to Dr. Obaisi to obtain a renewal of his Tramadol prescription. *Id.* ¶ 33. Brown saw Dr. Obaisi on October 22, at which time Dr. Obaisi renewed his Tramadol prescription for another 90 days. *Id.* ¶ 37.

Brown received X-rays of both of his shoulders on October 6. *Id.* ¶ 35. Dr. Martija reviewed the X-rays on October 24 and found that Brown had mild DJD in his shoulders. *Id.* ¶ 38.

DJD, also known as osteoarthritis, is a joint disease caused by the breakdown of joint cartilage and underlying bone. *Id.* ¶ 36. Upon reviewing Brown's medical records, Dr. Martija saw that Brown was already receiving Tramadol and determined that further evaluation or treatment was not required at that time, because Tramadol was "more th[an] sufficient" to treat any pain associated with DJD. *Id.* ¶ 38.

Brown next complained of pain in his shoulders at an appointment with Dr. Obaisi in April 2016. *Id.* ¶ 42. In response, Dr. Obaisi prescribed Naprosyn, a non-steroidal anti-inflammatory drug used to treat musculoskeletal pain. *Id.* This was in addition to the Tramadol he had previously prescribed for Brown's back pain. *Id.*

Brown also received two orthopedic evaluations and a pain-management consultation at UIC between March 22 and August 10, 2016. *Id.* ¶¶ 41, 44. Brown's medical records from his appointments at UIC do not document any complaints regarding pain in his shoulders. *Id.*

### C. Presbyopia

In December 2012, Brown had an optometry appointment at Stateville and was diagnosed with presbyopia. *Id.* ¶ 65. Presbyopia is caused by the aging of the eye and is treated with corrective lenses. *Id.* ¶ 66. Brown received prescription glasses soon after his December 2012 diagnosis. *Id.* ¶ 65. In November 2014, Brown returned for a second optometry appointment, at which his prescription was updated. *Id.* ¶ 67. Brown received glasses conforming to his new prescription soon thereafter. *Id.*

Brown requested new reading glasses from Dr. Obaisi during a medical appointment in August 2015. *Id.* ¶ 69. In response, Dr. Obaisi referred Brown to the Stateville optometrist, who provided Brown an updated prescription in November 2016. *Id.* ¶¶ 69, 71. Brown received glasses conforming to his November 2016 prescription on December 30, 2016. Pl.'s Wexford LR 56.1(b)(3)(C) Stmt. ¶ 1.

According to Brown, he also submitted numerous medical-service requests for an optometry appointment between July and December 2015, but was not given an appointment. Wexford Defs.' Ex. 1, Brown Dep. at 41, ECF No. 59-1.  In addition, Brown stated that he had discussed his unfulfilled request for an optometry appointment at least once with both Dr. Martija and Ms. Williams.  *Id*. at 43–46.  Brown also acknowledged that his conversation with Dr. Martija may have occurred in 2014 (prior to his request for the appointment) and that he could not remember when his conversation with Ms. Williams occurred.  *Id*. at 45.  Neither Dr. Obaisi, nor Dr. Martija, nor Ms. Williams ever reviewed Brown's written requests for an optometry appointment, as medical-service requests are reviewed and triaged by nursing staff and medical technicians.  Wexford Defs.' LR 56.1(a)(3) Stmt. ¶ 72.

In the intervening period between July 2015 (when Brown claims to have begun requesting an optometry appointment) and December 2016 (when Brown received new glasses), Brown still had use of his previously prescribed glasses.  *Id*. ¶ 68; Brown Dep. at 38–41.

### D.    Asthma

In October 2014, Brown attended Stateville's asthma clinic and was seen by Dr. Martija. Wexford Defs.' LR 56.1(a)(3) Stmt. ¶ 8.  Dr. Martija performed several tests on Brown's lungs, found that his asthma was under "fair control," and prescribed Brown two asthma medications: Xopenex, a "rescue inhaler" used to treat acute asthma attacks; and Alvesco, which is intended to be used daily.  *Id*. ¶¶ 8–9.

Three months later, at Brown's next asthma-clinic appointment, Dr. Martija found that Brown's asthma was in "good control" and reduced his Alvesco dosage.  *Id*. ¶ 12.  Several months later, Dr. Martija again found that Brown's asthma was under "good control."  *Id*. ¶¶ 13, 15.  Dr. Martija concluded that Brown's asthma was in remission and determined that Brown no longer

needed the daily Alvesco asthma medication, which she discontinued. *Id.* ¶ 16. She refilled Brown's Xopenex prescription for use in case of an acute asthma attack. *Id.*

Brown testified that at some point in August, he informed a nurse that his Alvesco prescription had expired and that he was experiencing wheezing and congestion. Brown Dep. at 57, 60. Brown stated that he repeatedly asked nurses for his Alvesco to be refilled, *id.* at 64, and contends that he had a number of asthma attacks after running out of Alvesco on August 1. Pl.'s Wexford LR 56.1(b)(3)(C) Stmt. ¶ 3.

On October 20, a nurse conveyed Brown's request for Alvesco to Dr. Martija. Wexford Defs.' LR 56.1(a)(3) Stmt. ¶ 17. She immediately renewed the prescription. *Id.* Brown's asthma then remained under fair-to-good control. *Id.* ¶¶ 21, 26, 28.

Neither Dr. Obaisi, nor Dr. Martija, nor Ms. Williams was aware of any of the complaints Brown claims to have lodged with Stateville medical personnel regarding his asthma between July 9 and October 20, 2015. *Id.* ¶ 20. In addition, the parties agree that it is the "custom and practice" of Stateville medical personnel to document inmates' complaints in their medical records, *id.* ¶ 19, and that Brown's medical records contain no documentation of any complaints regarding the expiration of his Alvesco medication or of acute asthma attacks between July 9 and October 20, 2015. *Id.* ¶ 20.

## II. Correspondence with Dr. Shicker

Dr. Shicker was the IDOC Agency Medical Director. Shicker's LR 56.1(a)(3) Stmt. ¶ 2. Brown mailed two letters to Dr. Shicker describing the purportedly inadequate treatment for BPH, DJD, and presbyopia that he was receiving at Stateville. Pl.'s Shicker LR 56.1(b)(3)(C) Stmt. ¶ 1, ECF No. 66.[3] Brown sent the letters from Stateville by U.S. Mail in March 2016, and neither letter

---

[3] Although Brown retained a copy of the letters, Brown Dep. at 124, neither party entered them into the record. But Brown testified that he wrote in both letters about the "lack of care" he was receiving for

was returned to him. *Id*. ¶¶ 1–2. Dr. Shicker testified that he did not recall receiving either letter and that he did not have any interactions with Dr. Obaisi, Dr. Martija, or Ms. Williams regarding Brown's BPH, DJD, or presbyopia. Shicker's LR 56.1(a)(3) Stmt. ¶¶ 8–10.

From 2010 through 2016, Lisa Moss worked as Dr. Shicker's Executive Secretary. *Id*. ¶ 17. Moss's job duties included opening and providing Dr. Shicker with correspondence from inmates. *Id*. ¶ 18. Moss testified that after she provided inmate correspondence to Dr. Shicker, she would store the correspondence in the inmate's file in Dr. Shicker's office. *Id*. ¶ 19. Moss conducted a review of Brown's file and did not find any letters from Brown between 2014 and 2016. *Id*. ¶ 21.

### III.    Grievance Filings

Brown filed four emergency grievances pertinent to the allegations in this lawsuit. Wexford Defs.' LR 56.1(a)(3) Stmt. ¶¶ 73, 75, 77, 79. These are dated September 29, 2015; November 16, 2015; December 17, 2015; and April 12, 2016. *Id*. Brown's grievances complained of delays in refilling Brown's Tramadol prescription; failure by the Wexford Defendants to refer Brown to off-site specialists regarding his DJD, BPH, and presbyopia; and Dr. Martija's discontinuance of Brown's Alvesco asthma inhaler. *Id*. ¶¶ 73, 77, 79; Wexford Defs.' LR 56.1(a)(3) Stmt., Ex. 9, Nov. 16 Grievance at 1–2, ECF No. 59-9.

Each grievance proceeded in the same manner. First, the Stateville warden determined that the grievance was not an emergency and directed Brown to resubmit the grievance as a non-emergency issue. Wexford Defs.' LR 56.1(a)(3) Stmt. ¶¶ 73, 75, 77, 79. Brown then appealed the warden's denial of emergency status to the IDOC Administrative Review Board ("ARB"). *Id*.

---

BPH, DJD, and presbyopia. *Id*. at 123–25. And Dr. Shicker was shown a copy of Brown's letters at his deposition, at which time Dr. Shicker appears to have read the letters and acknowledged that they complained of inadequate treatment of Brown's BPH, DJD, and presbyopia. Shicker's Ex. 2, Shicker Dep. at 19–22, ECF No. 54-2.

¶¶ 74, 76, 78, 80. The ARB denied all four appeals, the last on June 3, 2016. *Id*. ¶¶ 73–80. And Brown filed the instant lawsuit on November 7, 2016.

### Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Shell v. Smith*, 789 F.3d 715, 717 (7th Cir. 2015). To survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead must "establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012). In reviewing a motion for summary judgment, the Court gives the nonmoving party "the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013). The Court must not make credibility determinations or weigh conflicting evidence. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010).

Moreover, Rule 56 requires the district court to grant a motion for summary judgment after discovery "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of establishing that there is no genuine issue of material fact. *See id*. Once the moving party has sufficiently demonstrated the absence of a genuine issue of material fact, the nonmoving party must then set forth specific facts showing that there are disputed material facts that must be decided at trial. *See id*. at 321–22.

## Analysis

Brown claims that Dr. Obaisi, Dr. Martija, and Ms. Williams acted with deliberate indifference to his medical needs when they failed to adequately treat his BPH and DJD, failed to timely secure Brown an optometry appointment, and discontinued his asthma medication for several months. In seeking summary judgment, the Wexford Defendants argue that Brown failed to exhaust his administrative remedies and that no reasonable jury could conclude that Brown has established the requisite elements of his claims.

Brown also brings deliberate indifference claims against Wexford itself under both vicarious liability and *Monell* theories. Wexford seeks summary judgment as to Brown's vicarious liability claim on the basis that his claims against the individual Wexford employees cannot prevail. Wexford further contends that Brown's *Monell* claim cannot survive because he has not adduced evidence that Wexford's policies impermissibly delay medical treatment on a widespread basis.

Lastly, Brown brings a deliberate indifference claim against Dr. Shicker for failing to address Brown's lack of medical treatment at Stateville. Dr. Shicker seeks summary judgment, contending that there is no evidence that he was aware of Brown's purported treatment deficiencies.

## I.     Exhaustion of Administrative Remedies

The Wexford Defendants first argue that Brown failed to exhaust his claims through the IDOC grievance process, as required by the Prison Litigation Reform Act ("PLRA"). 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006). Failure to exhaust is an affirmative defense on which the defendants bear the burden of proof. *Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013).

IDOC's grievance process requires inmates to "submit a written grievance to a designated grievance officer, who submits his [or her] recommendation to the institution warden." *Thornton v. Snyder*, 428 F.3d 690, 694 (7th Cir. 2005) (citing 20 Ill. Admin. Code §§ 504.810, 504.830). "Alternatively, an inmate can request that a grievance be handled on an emergency basis by submitting the grievance directly to the warden." *Id*. (citing 20 Ill. Admin. Code § 504.840). "A prisoner dissatisfied with the warden's decision has 30 days to appeal to the statewide Administrative Review Board, which reviews the warden's denial and issues a . . . final determination." *Boyce v. Ill. Dep't of Corr*., 661 F. App'x 441, 442 (7th Cir. 2016) (citing 20 Ill. Admin. Code § 504.840; *Roberts v. Neal*, 745 F.3d 232, 235 (7th Cir. 2014)).

The Seventh Circuit has held that one way an inmate may exhaust administrative remedies is when the inmate submits an emergency grievance to the warden, receives a denial that the grievance was an emergency, and appeals the warden's decision to the ARB. *See Kyles v. Williams*, 679 F. App'x 497, 498–99 (7th Cir. 2017) (citing *Thornton*, 428 F.3d at 694; 20 Ill. Admin. Code § 504.840); *Glick v. Walker*, 385 F. App'x 579, 583 (7th Cir. 2010). What is more, the Seventh Circuit recently held that an inmate need not even appeal to the ARB in such a situation. *Bentz v. Ghosh*, 718 F. App'x 413, 418 (7th Cir. 2017) (citing *Thornton*, 428 F.3d at 694); *see also Dent v. Burrell*, No. 3:16-CV-01263-NJR-DGW, 2018 WL 968513, at *4 (S.D. Ill. Feb. 20, 2018) (finding that an Illinois inmate had exhausted his administrative remedies upon the warden's determination that his grievance was not an emergency).

Here, Brown has exhausted his administrative remedies under either standard. Brown submitted all four grievances on an emergency basis. Wexford Defs.' LR 56.1(a)(3) Stmt. ¶¶ 73–80. In each case, the warden denied that the grievance was an emergency, and Brown appealed the warden's decision to the ARB. *Id*. As the ARB denied the last of Brown's appeals by June

11

2016, *id.*, and Brown did not file his complaint until November 2016, Compl. at 1, ECF No. 1, Brown properly exhausted his administrative remedies with respect to all his claims before instituting this action. *See Bentz*, 718 F. App'x at 418; *Kyles*, 679 F. App'x at 498–99. The Court thus turns to the merits of Brown's claims.

## II.     Claims Against Dr. Obaisi, Dr. Martija, and Ms. Williams

The Wexford Defendants seek summary judgment as to Brown's deliberate indifference claims against Dr. Obaisi, Dr. Martija, and Ms. Williams. A correctional officer's or health care provider's "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). To prevail on a claim for deliberate indifference, an inmate must show that (1) he had an objectively serious medical need, and (2) the defendant was subjectively aware of the inmate's medical need but consciously disregarded it. *Farmer v. Brennan*, 511 U.S. 825, 834, 837–38 (1994); *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011).

### A.     Objectively Serious Medical Need: BPH and Presbyopia

The Wexford Defendants argue that Brown has failed to offer evidence that BPH and presbyopia are objectively serious medical conditions. A serious medical condition is one that "has been diagnosed by a physician as mandating treatment," *Lewis v. McLean*, 864 F.3d 556, 563 (7th Cir. 2017) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)), or that a "reasonable doctor or patient would find important and worthy of comment or treatment." *Hayes v. Snyder*, 546 F.3d 516, 523 (7th Cir. 2008) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)). A medical condition need not be life-threatening to be objectively serious. *Gutierrez*, 111 F.3d at 1371. "Minor aches and pains," however, do not suffice. *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996).

The Wexford Defendants argue that BPH is not a serious medical condition because it is not painful, but merely inconvenient. Wexford Defs.' Mem. Supp. at 6, ECF No. 58. In response, Brown contends that the condition severely interferes with his sleep. Pl.'s Wexford Mem. Opp. ¶ C, ECF No. 65.

While the parties agree that the condition does not cause Brown pain, Wexford Defs.' LR 56.1(a)(3) Stmt. ¶ 46, it is undisputed that Brown has been diagnosed with BPH at least twice, *id*. ¶¶ 51–52. Moreover, Dr. Obaisi prescribed three different BPH medications, ordered two urine measurement tests, and referred Brown to a urology specialist to address the condition. *Id.* ¶¶ 51, 54, 56, 59, 61, 63. This is sufficient evidence for a reasonable jury to find that BPH is a condition that a "reasonable doctor or patient would find important and worthy of comment or treatment." *Hayes*, 546 F.3d at 523.

The Wexford Defendants also contend that presbyopia is not a serious medical condition. Wexford Defs.' Mem. Supp. at 5–6. District courts in the Seventh Circuit have held that "a lack of glasses results in an objectively serious medical condition when it significantly affects a prisoner's ability to see." *Dobbey v. Randle*, No. 11-CV-0146, 2013 WL 4821027, at *5 (N.D. Ill. Sept. 10, 2013). A deprivation of prescription lenses that is painful, causes a physical impairment such as blindness, or renders an inmate completely unable to see may constitute a serious medical need. *Id.; see also Gevas v. Shearing*, No. 14-CV-134-NJR-DGW, 2016 WL 1221937, at *5–6 (S.D. Ill. Mar. 29, 2016) (collecting cases and holding that a reasonable jury could conclude that a two-week deprivation of contact lenses that left the inmate "suffer[ing] in pain" and unable to see or read constituted a serious medical need).

But courts have held that a mere lack of prescription glasses is not a serious medical need if the inmate is able to read or write to some extent—even when doing so without glasses is

suboptimal. *See, e.g., Dobbey*, 2013 WL 4821027, at *5 (holding that inmate's blurred vision, which did not prevent the inmate from writing grievances and medical requests, could not constitute a serious medical condition); *Freshwater v. Brankle*, No. 1:04-CV-2-TS, 2005 WL 3159151, at *6 (N.D. Ind. Nov. 28, 2005) (finding that glasses needed to "alleviate headaches, blurred vision, and watery and burning eyes when reading" were not a serious medical need in light of the plaintiff's ability to write grievances).

Here, there is no dispute that Brown had glasses. But Brown argues that he needed an updated glasses prescription because the old glasses deprived him of the ability to read as well as he should. Pl.'s Wexford Mem. Opp. ¶ B. The evidence shows, though, that Brown was able to write grievances during the period in which he waited for an updated prescription. Wexford Defs.' LR 56.1(a)(3) Stmt. ¶¶ 73–80. Given this and the lack of evidence that using an outdated prescription caused Brown pain or physical harm, the Court concludes that no reasonable jury could find that Brown's presbyopia was objectively serious. *See Dobbey*, 2013 WL 4821027, at *5; *Freshwater*, 2005 WL 3159151, at *6. The Wexford Defendants are thus entitled to summary judgment as to Brown's claim of deliberate indifference with respect to his presbyopia on this basis.[4]

## B.     Subjective Deliberate Indifference

The Wexford Defendants next argue that Brown cannot prove the subjective element of his remaining deliberate indifference claims. To establish this element, an inmate must show that a prison official was aware of the inmate's serious medical needs and consciously disregarded a significant risk to the inmate's health or safety. *Grieveson v. Anderson*, 538 F.3d 763, 775 (7th

---

[4]      As the Court finds that Brown's presbyopia does not constitute an objectively serious medical condition and thus cannot sustain a deliberate indifference claim, the Court does not address the subjective element of Brown's claim.

Cir. 2008). "[A] reasonable jury can infer a defendant's subjective deliberate indifference based upon evidence that the defendant ignored a request for treatment, substantially departed from accepted professional standards[,] . . . persisted in an ineffective course of treatment, or inexplicably delayed treatment." *Williams v. Ghosh*, No. 10 C 162, 2017 WL 3780315, at *7 (N.D. Ill. Aug. 31, 2017) (citing *Petties v. Carter*, 836 F.3d 722, 729–31 (7th Cir. 2016) (*en banc*)).

"Showing mere negligence" on the part of an official "is not enough." *Petties*, 836 F.3d at 728 (citing *Estelle*, 429 U.S. at 106). For example, "an incorrect diagnosis or improper treatment does not state an Eighth Amendment claim." *Gutierrez*, 111 F.3d at 1374 (citation omitted); *see Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (collecting cases). Accordingly, "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances. Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (internal quotation marks and citations omitted). Rather, a doctor's decision to pursue a particular course of treatment must represent "so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." *Id.* (citing *Roe*, 631 F.3d at 857).

### 1. BPH

Brown claims that Ms. Williams and Dr. Obaisi were deliberately indifferent to his urinary frequency issues because they failed to adequately examine Brown for this condition, refused to refer him to an off-site urology specialist, and did not change Brown's course of treatment when his medications proved ineffective. Am. Compl. Stmt. of Facts ¶¶ 7–8, 11, ECF No. 23. The Wexford Defendants contend that Ms. Williams and Dr. Obaisi, in fact, administered diagnostic

tests confirming Brown's BPH diagnosis and repeatedly altered Brown's course of treatment. Wexford Defs.' Mem. Supp. at 11.

Brown's claims are unsupported by the record. It is undisputed that, on October 1, 2013, Ms. Williams administered a digital rectal examination, which revealed a slightly enlarged prostate, before determining that BPH was the cause of Brown's urinary frequency issues. Wexford Defs.' LR 56.1(a)(3) Stmt. ¶ 52. The parties agree that BPH is typically diagnosed via digital rectal examination. *Id*. ¶ 48. In addition, Ms. Williams ordered diagnostic laboratory tests to rule out more serious causes of Brown's urinary frequency issues, such as prostate cancer. *Id*. ¶ 52. And as to Dr. Obaisi, the undisputed record shows that Brown had numerous appointments with him regarding this condition and that Dr. Obaisi provided and adjusted Brown's medications accordingly. *Id*. ¶¶ 54–63.

Moreover, it is undisputed that both Ms. Williams and Dr. Obaisi changed Brown's course of treatment every time Brown reported that his current medications were not working. At each appointment in which Brown complained of urinary frequency issues, Dr. Obaisi and Ms. Williams changed the type or dosage of Brown's medications—including prescribing three different BPH medications—or ordered further diagnostic tests. *Id*. ¶¶ 51–52, 54–57, 59, 61–62.

In light of these undisputed facts, no reasonable jury could find that Ms. Williams and Dr. Obaisi acted with deliberate indifference to Brown's medical needs based on an alleged failure to examine or treat him.

Brown also contends that Dr. Obaisi and Ms. Williams were deliberately indifferent in not referring him to a specialist when his various BPH medications were not working. Pl.'s Wexford LR 56.1(b)(3)(C) Stmt. ¶ 7; Pl.'s Wexford Mem. Opp. ¶ F. This argument fails for two reasons. First, Dr. Obaisi testified that, as of December 2017, he had in fact referred Brown to UIC for a

urology consultation. Wexford Defs.' LR 56.1(a)(3) Stmt. ¶ 63. Brown has offered no evidence to rebut this.

Second, an inmate's failure to adduce evidence that a doctor's treatment decision was a "substantial departure from accepted medical judgment" entitles the physician to summary judgment. *Whiting*, 839 F.3d at 663–64. In *Whiting v. Wexford Health Sources, Inc.*, for example, the Seventh Circuit held that a physician's decision to treat an inmate's symptoms with antibiotics before ordering a biopsy that eventually revealed cancer could not constitute deliberate indifference because the inmate had failed to present evidence that the antibiotics treatment substantially departed from accepted medical practice. *Id.*; *see also Arnett v. Webster*, 658 F.3d 742, 759 (7th Cir. 2011) ("Without some evidence, such as expert opinion testimony, creating a reasonable inference that [the physician's] treatment during this time frame was so inadequate that it demonstrated an absence of professional judgment, [the inmate] cannot succeed against [the physician] on summary judgment.").

A physician's decision not to refer an inmate to a specialist is governed by the same standard. *See Pyles*, 771 F.3d at 411 (reasoning that the "choice whether to refer a prisoner to a specialist" is evaluated under the same standard as "other medical decisions" involving the exercise of medical discretion (citation omitted)). For instance, in *Pyles v. Fahim*, the court held that a physician who responded to an inmate's continued complaints of back pain by "prescribing new medications or changing the dosages," rather than referring the inmate to a specialist, was entitled to summary judgment because nothing in the record suggested that the doctor's treatment decision was "blatantly inappropriate." 771 F.3d at 412; *see also Harrison v. Wexford Health Sources, Inc.*, 669 F. App'x 797, 799 (7th Cir. 2016) (finding that a physician's treatment of an inmate's pain with "pain-relieving, anti-inflammatory, and muscle-relaxing drugs" for 17 months

before referring the inmate to a specialist could not constitute deliberate indifference because the inmate had not "pointed to any evidence . . . that the treatment was 'blatantly inappropriate' or otherwise violated professional medical standards" (citing *Pyles*, 771 F.3d at 409)).

Thus, even if Dr. Obaisi had not referred Brown to a specialist, Brown has presented no evidence that such a decision would have been "'blatantly inappropriate' or otherwise violated professional medical standards." *Harrison*, 669 F. App'x at 799. As such, no reasonable jury could find that Ms. Williams or Dr. Obaisi were deliberately indifferent in failing to refer Brown to a specialist for his BPH. *See id.*; *Pyles*, 771 F.3d at 411. Ms. Williams and Dr. Obaisi are therefore entitled to summary judgment as to Brown's deliberate indifference claim regarding his BPH treatment.

### 2. DJD

Brown also asserts deliberate indifference claims against Ms. Williams, Dr. Martija, and Dr. Obaisi with regard to his treatment for DJD. Brown alleges that Ms. Williams failed to renew his prescription pain medication, Dr. Martija failed to treat him after she diagnosed him with DJD, and Dr. Obaisi failed to treat Brown's shoulder pain. Am. Compl. Stmt. of Facts ¶¶ 14, 16–18. The Wexford Defendants argue that Brown has offered no evidence that Ms. Williams's, Dr. Martija's, or Dr. Obaisi's responses to Brown's DJD contravened accepted professional standards. Wexford Defs.' Mem. Supp. at 9–10.

First, Brown has submitted no evidence that Ms. Williams' decision not to renew his prescription pain medication substantially departed from accepted medical judgment. When Brown first complained of pain in his shoulders in October 2015, he requested that Ms. Williams address his shoulder pain by renewing his Tramadol prescription (originally prescribed for unrelated back pain). Wexford Defs.' LR 56.1(a)(3) Stmt. ¶¶ 30, 32–33; Am. Compl. Stmt. of Facts ¶ 16. Ms. Williams informed Brown that she could not renew his Tramadol prescription and

instead referred Brown for an appointment with Dr. Obaisi, who could renew the prescription. Wexford Defs.' LR 56.1(a)(3) Stmt. ¶¶ 33–34; Pl.'s Wexford LR 56.1(b)(3)(C) Stmt. ¶ 5. In addition, Ms. Williams ordered X-rays of both of Brown's shoulders and offered to prescribe Tylenol, which Brown rejected. Wexford Defs.' LR 56.1(a)(3) Stmt. ¶ 33.

The parties agree that Ms. Williams does not have the ability to prescribe narcotic-strength medication such as Tramadol for an extended period. *Id.* ¶ 34. Moreover, Brown offers no evidence that ordering X-rays and prescribing Tylenol, as opposed to refilling Brown's Tramadol prescription, represented a departure from accepted medical judgment. A reasonable jury thus could not find that Ms. Williams was deliberately indifferent to Brown's DJD. *See Whiting*, 839 F.3d at 663–64; *Arnett*, 658 F.3d at 759.[5]

Brown claims that Dr. Martija, too, was deliberately indifferent to his DJD. Am. Compl. Stmt. of Facts ¶¶ 17–18. It is undisputed, however, that after reviewing Brown's X-rays, finding mild DJD in both of Brown's shoulders, and learning that Brown was currently taking Tramadol, Dr. Martija determined that further evaluation or treatment was not required at that time. Wexford Defs.' LR 56.1(a)(3) Stmt. ¶ 38. This was because Tramadol is "more th[an] sufficient" to treat any pain associated with DJD. *Id.* And Brown did not raise any complaints regarding pain in his shoulders at subsequent appointments with Dr. Martija. *Id.* ¶ 43. Because there is no evidence in

---

[5] Brown also argues that Ms. Williams's refusal to renew his Tramadol prescription was a vindictive effort to withhold aid from Brown in retaliation for a separate § 1983 action that Brown had filed against Ms. Williams. Pl.'s Wexford Mem. Opp. ¶ E. Brown did not assert a First Amendment retaliation claim in his pleadings. But even if the Court were to consider such a claim at this stage, it would fail on the merits, as Brown has provided nothing more than sheer speculation for such a claim. *See Devbrow v. Gallegos*, 735 F.3d 584, 588 (7th Cir. 2013) ("[S]peculation concerning retaliatory motives cannot create a genuine issue of material fact." (citing *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008))). To the contrary, it is undisputed that Ms. Williams attempted to find the cause of Brown's pain and tried to prescribe him pain medication, which he refused.

the record that Dr. Martija's treatment decision departed from accepted medical judgment, no reasonable jury could conclude that Dr. Martija was deliberately indifferent to Brown's DJD.

Lastly, Brown claims that Dr. Obaisi was deliberately indifferent to his shoulder pain. Am. Compl. Stmt. of Facts ¶ 14. Brown asserts that at an April 2016 appointment, Brown "reminded Obaisi of the constant pain in both of his shoulders" and that "Obaisi failed to address [it]." *Id.* But the undisputed record belies this claim. At the appointment, Dr. Obaisi prescribed Brown Naprosyn (a drug for musculoskeletal pain) in addition to the Tramadol that Dr. Obaisi had previously prescribed. Wexford Defs.' LR 56.1(a)(3) Stmt. ¶ 42. The record contains no indication that Brown mentioned his shoulder pain to Dr. Obaisi at any other time or that Dr. Obaisi's decision to treat the condition with pain medication was a departure from accepted medical judgment. Rather, the parties agree that, subsequent to this appointment, Brown received a pain management consultation at UIC, at which he did not register any complaints regarding pain in his shoulders. *Id.* ¶ 44. As the record contains no evidence that Dr. Obaisi's decision to treat Brown's shoulder pain with Naprosyn departed from accepted professional standards or that Dr. Obaisi subsequently ignored Brown's complaints of pain in his shoulders, no reasonable jury could find that Dr. Obaisi acted with deliberate indifference to Brown's DJD.

In sum, Ms. Williams, Dr. Martija, and Dr. Obaisi are entitled to summary judgment as to Brown's claims regarding his DJD treatment.

### 3. Asthma

Brown also brings a deliberate indifference claim against Dr. Martija for her treatment of Brown's asthma. Brown claims that Dr. Martija's decision to discontinue his Alvesco medication and her failure to renew the prescription for several months substantially departed from accepted standards of care. Am. Compl. Stmt. of Facts ¶ 5. In response, the Wexford Defendants argue that there is no evidence that Dr. Martija's decision to discontinue the Alvesco departed from

20

accepted medical judgment. Wexford Defs.' Mem. Supp. at 7–8. The Wexford Defendants further contend that Dr. Martija was unaware of Brown's requests that the prescription be renewed. *Id*.

It is undisputed that Dr. Martija monitored Brown's asthma symptoms over the course of nine months before discontinuing his Alvesco prescription. Three months after first prescribing Alvesco, Dr. Martija found that Brown's asthma had improved from being under "fair control" to "good control." Wexford Defs.' LR 56.1(a)(3) Stmt. ¶¶ 8–9, 12. She reduced Brown's Alvesco dosage accordingly. *Id*. Six months later, Dr. Martija found that Brown's asthma was still under "good control" and in remission. *Id*. ¶¶ 13, 15–16. She determined that he no longer required daily asthma medication. *Id*. ¶ 16. Brown has put forth no evidence to suggest that these treatment decisions departed from accepted medical judgment.

Brown's claim that Dr. Martija's refusal to renew the prescription between August and October 2015 was deliberately indifferent is similarly unavailing. Brown has cited to no evidence that Dr. Martija was aware of his requests for renewal. The Seventh Circuit has made clear that "a plaintiff must provide evidence that an official *actually* knew of and disregarded a substantial risk of harm." *Petties*, 836 F.3d at 728 (citing *Farmer*, 511 U.S. at 837) (emphasis in original); *see also, e.g., Cesal v. Moats*, 851 F.3d 714, 723 (7th Cir. 2017) (finding that a prison doctor could not have been deliberately indifferent to an inmate's injury without having been aware of it). Brown points only to the fact that sometime after his medication ran out, his asthma worsened and he complained of "wheezing and congestion" to a nurse. Pl.'s Wexford Mem. Opp. ¶ D; Pl.'s Wexford LR 56.1(b)(3)(C) Stmt. ¶ 3. However, the parties agree that Dr. Martija was "not aware of any purported complaints that Plaintiff made to medical staff regarding his asthma" between July 2015 (when Dr. Martija discontinued Brown's Alvesco prescription) and October 2015, when Dr. Martija immediately renewed the prescription per Brown's request. Wexford Defs.' LR

56.1(a)(3) Stmt. ¶¶ 17, 20. Thus, no reasonable jury could conclude that Dr. Martija was deliberately indifferent to Brown's asthma. *See Cesal*, 851 F.3d at 723.

Accordingly, Dr. Martija is entitled to summary judgment as to Brown's asthma claim.

### III. Claims Against Wexford

Brown also claims that Wexford is liable for deliberate indifference to his medical needs. First, he argues that Wexford is vicariously liable for the actions of Dr. Obaisi, Dr. Martija, and Ms. Williams. Am. Compl. Stmt. of Facts ¶ 26. Second, he contends that Wexford is liable under *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978). *Id*. ¶¶ 27–28. Wexford argues that it cannot be vicariously liable for the actions of its employees because Brown has no viable claim against any of them. Wexford Defs.' Mem. Supp. at 14–15. Wexford further contends that there is no evidence to support Brown's *Monell* claim. *Id*. at 13–14.

The Seventh Circuit has held that "[y]ou can't have vicarious liability without primary liability" on the part of individual employees. *Gordon v. Degelmann*, 29 F.3d 295, 298 (7th Cir. 1994); *see Montague v. Wexford Health Sources, Inc.*, 615 F. App'x 378, 379 (7th Cir. 2015) (stating that if the "individual defendants [have] all prevailed . . . there is no constitutional tort for which Wexford could be vicariously liable" (citing *City of Los Angeles v. Heller*, 475 U.S. 796 (1986))). Here, Dr. Obaisi, Dr. Martija, and Ms. Williams are entitled to summary judgment on all claims against them. As such, Brown's vicarious liability claim against Wexford cannot survive summary judgment.

Brown's *Monell* claim also cannot withstand scrutiny. A corporation that has contracted to provide prisoners with medical care may be liable under § 1983. *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927–28 (7th Cir. 2004) (holding that the *Monell* liability standard applies to corporations as well). But to proceed to trial on this claim, Brown must offer evidence

22

that a Wexford policy, custom, or practice was the "direct cause" or "moving force" behind a constitutional violation. *Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010).

Brown alleges that Wexford had a widespread practice of deliberately delaying necessary medical care in order to cut costs and that this prolonged the suffering of Brown and other inmates. Am. Compl. Stmt. of Facts ¶ 27. However, Brown has admitted that he "has not . . . come across any set of facts that [ ] can show [that] Wexford had an official policy or custom and [*sic*] practice that was a moving force behind any deprivation of plaintiff's constitutional rights." Pl.'s Wexford Mem. Opp. ¶ H. Indeed, he has submitted no evidence that any of the delays he experienced—for instance, in obtaining a referral to a urology specialist for his urinary frequency issues, obtaining refills or renewals of prescription medications, or securing an optometry appointment—were caused by an official Wexford policy, custom, or practice. Wexford is therefore entitled to summary judgment on this claim. *See Minix*, 597 F.3d at 832.

## IV. Claims Against Defendant Shicker

Finally, Brown brings a deliberate indifference claim against Dr. Shicker for failing to address the inadequate medical treatment Brown purportedly received at Stateville. Am. Compl. ¶¶ Stmt. of Facts 9–10. Dr. Shicker argues that Brown has failed to show any evidence that he was personally involved in or knew about any purported inadequacies in Brown's medical care. Shicker's Mem. Supp. at 5–6, ECF No. 53.

"Individual liability under 42 U.S.C. § 1983 can only be based on a finding that the defendant caused the deprivation at issue." *Kelly v. Mun. Cts. of Marion Cty., Ind.*, 97 F.3d 902, 909 (7th Cir. 1996) (citing *Monell*, 436 U.S. at 694). "To be personally responsible, an official 'must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye.'" *Johnson v. Snyder*, 444 F.3d 579, 583 (7th Cir. 2006) (citing *Gentry v. Duckworth*, 65 F.3d 555,

561 (7th Cir. 1995)), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013).

Brown sent two letters to Dr. Shicker complaining of inadequate BPH, DJD, and presbyopia treatment at Stateville. Pl.'s Shicker LR 56.1(b)(3)(C) Stmt. ¶ 1–2. The only evidence Brown cites to support his contention that Dr. Shicker received and read the letters is that they were not returned as undeliverable. *Id.* ¶ 2; Pl.'s Shicker Mem. Opp. ¶ 3, ECF No. 63. But whether Dr. Shicker actually read Brown's letters is immaterial because, for the reasons noted above, the underlying claims against Dr. Obaisi, Dr. Martija, and Ms. Williams are unsubstantiated by the evidence.

In this regard, the Seventh Circuit's decision in *Arce v. Barnes* is instructive. 662 F. App'x 455 (7th Cir. 2016). In *Arce*, an inmate wrote a letter to the prison superintendent describing allegedly inadequate medical treatment and requested assistance. *Id.* at 456–57. The superintendent never responded to the inmate's letter. *Id.* The court found that even if the superintendent had had "'reason to believe (or actual knowledge) that prison doctors or their assistants [were] mistreating (or not treating)' [the inmate]," the superintendent could not be liable because the deliberate indifference claims against all of the defendants directly involved in administering the allegedly inadequate care had been dismissed. *Id.* at 459 (quoting *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012)); *see also, e.g., Riley El v. Godinez*, No. 13 C 5768, 2016 WL 4505038, at *15 (N.D. Ill. Aug. 29, 2016) (holding that an inmate's claim against the IDOC Director, to whom he had written letters alleging inadequate medical treatment from a prison physician, "must fail as a matter of law" because "there is no evidence of deliberate indifference in the record against [the physician]" (citing *Rosado v. Gonzalez*, 832 F.3d 714, 718 (7th Cir. 2016))).

The same is true here, and Dr. Shicker cannot be liable for failing to address the medical treatment that Dr. Obaisi, Dr. Martija, and Ms. Williams had provided to Brown. *See Arce*, 662 F. App'x at 459; *Riley El*, 2016 WL 4505038, at *15. Dr. Shicker is therefore entitled to summary judgment.

## <u>Conclusion</u>

For the foregoing reasons, the Wexford Defendants' and Dr. Shicker's motions for summary judgment [52] [57] are granted. Judgment will be entered in favor of Defendants. This case is hereby terminated.


**IT IS SO ORDERED.**                                    **ENTERED   9/18/18**

_____
**John Z. Lee**
**United States District Judge**